Citation Nr: 1641949 
Decision Date: 10/31/16 Archive Date: 11/08/16

DOCKET NO. 08-26 143A ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to service connection for bilateral hearing loss.

2. Entitlement to service connection for tinnitus.

3. Entitlement to an initial rating in excess of 30 percent for anxiety disorder, prior to March 24, 2008, in excess of 50 percent from March 24, 2008, until July 14, 2009, and in excess of 70 percent on July 14, 2009, and thereafter. 

4. Entitlement to a total disability rating based on individual unemployability due to service connected disability (TDIU), prior to July 14, 2009.


REPRESENTATION

Appellant represented by: The American Legion
ATTORNEY FOR THE BOARD

Dustin Ware, Associate Counsel


INTRODUCTION

The Veteran served on active duty from July 1965 to December 1968.

This matter comes before the Board of Veteran's Appeals (Board) on appeal from February and July 2008 Rating Decisions issued by the Department of Veterans Affairs (VA) Regional Office (RO) in St. Petersburg, Florida.

The appellant in this case is the Veteran's surviving spouse, who has been properly substituted for the Veteran in accordance with the Veterans' Benefits Improvement Act of 2008, Pub. L. No. 110-389, § 212, 122 Stat. 4145, 4151 (2008) (creating a new 38 U.S.C. § 5121A that allows substitution following the death of a claimant who dies on or after October 10, 2008); 38 C.F.R. § 3.1010 (2015). Under this statute, an eligible person may substitute for the veteran in a "pending claim:" a claim filed by the veteran that is still awaiting a decision from the Agency of Original Jurisdiction (AOJ) at the time of the veteran's death. 38 U.S.C.A. § 5121A (West 2014); 38 CFR § 3.1010. Such a request must be filed not later than one year after the date of the veteran's death. 38 U.S.C.A. § 5121A. A person eligible for this substitution will include "a living person who would be eligible to receive accrued benefits due to the claimant under section 5121(a) of this title ...;" the veteran's spouse is one such person. Id.; 38 U.S.C.A. § 5121(a). In January 2013, the appellant submitted a VA Form 21-534, Application for Dependency and Indemnity Compensation, Death Pension and Accrued Benefits by a Surviving Spouse or Child. In the remarks section of the form the appellant stated that her husband had a claim pending at the time of his death and that she requests the benefits on that claim. Because this request was filed within a year of the Veteran's November 2012 death, it is read as a request by the appellant to be substituted for the deceased Veteran. As such, these claims are properly before the Board. 

The Veteran has already been awarded a TDIU due to service-connected disability effective July 14, 2009, however, the evidence of record indicates that a TDIU is warranted for a period prior to this date. The United States Court of Appeals for Veterans Claims (Court) has held that a TDIU claim is part and parcel of an initial or increased rating claim when raised by the record. Mayhue v. Shinseki, 24 Vet. App. 273 (2011); Rice v. Shinseki, 22 Vet. App. 447 (2009). In other words, the Board has jurisdiction to consider the Veteran's possible entitlement to a TDIU rating when this issue is raised by assertion or reasonably indicated by the evidence and is predicated at least in part on the severity of the service-connected disability in question, regardless of whether the RO has expressly addressed this additional issue. See VAOPGCPREC 6-96 (Aug. 16, 1996). See also Caffrey v. Brown, 6 Vet. App. 377 (1994); Fanning v. Brown, 4 Vet. App. 225, 229 (1993); EF v. Derwinski, 1 Vet. App. 324 (1991). As the Court has held in Rice that a request for a TDIU is not a separate claim for benefits, but rather involves an attempt to obtain an appropriate rating for a disability, the Board finds that the issue of entitlement to a TDIU is before the Board as part of the Veteran's increased rating claim for anxiety disorder. Therefore, the Board will assume jurisdiction of the issue of entitlement to a TDIU, prior to July 14, 2009, as indicated on the title page.

The appellant submitted a statement dated February 25, 2016, indicating that she is "requesting the additional 'kicker' for close to $1,480.00 a month." It is unclear to the Board exactly what the appellant is addressing, however, it may be an issue raised by the record, but not adjudicated by the AOJ, for which the Board does not have jurisdiction. If it is, referral to the AOJ for appropriate action would be necessary. 38 C.F.R. § 19.9(b) (2015). As such, the Board suggests the AOJ contact the appellant to determine exactly what she is seeking.
The issues of entitlement to service connection for bilateral hearing loss and tinnitus are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. Affording the Veteran the benefit of the doubt, throughout the appeals period, the Veteran's anxiety disorder was manifested by symptoms that showed occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood. 

2. Prior to July 14, 2009, affording the Veteran the benefit of the doubt, the evidence of record indicates the Veteran's service-connected anxiety disorder rendered him unable to secure of follow a substantially gainful occupation.


CONCLUSIONS OF LAW

1. Prior to July 14, 2009, the criteria for an initial evaluation of 70 percent, but no greater, for anxiety disorder have been met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 4.3, 4.7, 4.130, Diagnostic Code 9413 (2015).

2. As of July 14, 2009, the criteria for an evaluation in excess of 70 percent for anxiety disorder have not been met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 4.3, 4.7, 4.130, Diagnostic Code 9413 (2015).

3. Prior to July 14, 2009, the criteria for entitlement to a TDIU have been met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 3.102, 4.3, 4.16 (2015).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

When VA receives a complete or substantially complete application for benefits, it must notify the claimant of the information and evidence not of record that is necessary to substantiate a claim, which information and evidence VA will obtain, and which information and evidence the claimant is expected to provide. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126; 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a). See also Quartuccio v. Principi, 16 Vet. App. 183 (2002); Pelegrini v. Principi, 18 Vet. App. 112 (2004).

In cases such as this, where service connection has been granted and an initial disability rating and effective date have been assigned, the typical service connection claim has been more than substantiated, it has been proven, thereby rendering 38 U.S.C.A. § 5103(a) notice no longer required because the purpose that the notice is intended to serve has been fulfilled. Dingess v. Nicholson, 19 Vet. App. 473 (2006); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). The appellant bears the burden of demonstrating any prejudice from defective notice with respect to downstream elements. Goodwin v. Peake, 22 Vet. App. 128 (2008). There has been no allegation of such error in this case.

In light of the above, the Board finds that no useful purpose would be served by delaying appellate review to send out additional notice letters.

VA must also make reasonable efforts to assist the claimant in obtaining evidence necessary to substantiate the claim for the benefit sought, unless no reasonable possibility exists that such assistance would aid in substantiating the claim. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159 (2015).

Post-service VA and non-VA treatment records have also been associated with the claims file. The appellant has not identified any additional records that should be obtained prior to a Board decision. Therefore, VA's duty to further assist the claimant in locating additional records has been satisfied. See 38 U.S.C.A. § 5103A (d); see also 38 C.F.R. § 3.159 (c)(4) (2014); Wells v. Principi, 326 F.3d 1381 (Fed. Cir. 2003). The Veteran was afforded VA examinations in February 2008 and 2010. These VA examinations are adequate for the purposes of evaluating the Veteran's anxiety disorder, as they involved reviews of the Veteran's pertinent medical history as well as clinical evaluations of the Veteran, and provide adequate discussions of relevant symptomatology. See generally Barr v. Nicholson, 21 Vet. App. 303, 311 (2007).

Additionally, this case was brought before the Board in August 2010, at which time the claim for an increased initial rating for anxiety disorder was remanded to allow the Agency of Original Jurisdiction (AOJ) to further assist the appellant in the development of this claim, to include issuing a Supplemental Statement of the Case (SSOC) that considered all evidence associated with the claims file since the last SSOC was issued in March 2009. The requested development having been completed, the case is once again before the Board for appellate consideration of this issue on appeal. See Stegall v. West, 11 Vet. App. 268 (1998).

In light of the foregoing, the Board is satisfied that all relevant facts have been adequately developed to the extent possible; no further assistance to the appellant in developing the facts pertinent to the issue on appeal is required to comply with the duty to assist. 38 U.S.C.A. §§ 5103, 5103A; 38 C.F.R. § 3.159.

Analysis

Disability ratings are determined by the application of the VA's Schedule for Rating Disabilities (Schedule), which is based on the average impairment of earning capacity. Separate diagnostic codes identify the various disabilities. 38 U.S.C.A. § 1155; 38 C.F.R. Part 4 (2015). Pertinent regulations do not require that all cases show all findings specified by the Schedule, but that findings sufficient to identify the disease and the resulting disability and above all, coordination of the rating with impairment of function will be expected in all cases. 38 C.F.R. § 4.21 (2014); see also Mauerhan v. Principi, 16 Vet. App. 436 (2002). When a question arises as to which of two ratings apply under a particular diagnostic code, the higher evaluation is assigned if the disability more closely approximates the criteria for the higher rating. 38 C.F.R. § 4.7. After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the Veteran. 38 C.F.R. § 4.3.

Evidence to be considered in the appeal of an initial assignment of a disability rating is not limited to that reflecting the then current severity of the disorder. Fenderson v. West, 12 Vet. App. 119 (1999). In cases where an initially assigned disability evaluation has been disagreed with, it is possible for a veteran to receive a staged rating; that is, be awarded separate percentage evaluations for separate periods based on the facts found during the appeal period. Fenderson at 126-28; see also Hart v. Mansfield, 21 Vet. App. 505 (2007).

The Veteran asserted that his PTSD was more severe than contemplated by the assigned evaluations. Service connection for PTSD has been granted and an initial 30 percent evaluation has been assigned prior to March 24, 2008, with a 50 percent evaluation being assigned from March 24, 2008, until July 14, 2009, and a 70 evaluation being assigned July 14, 2009, and thereafter. All evaluation are assigned pursuant to the provisions of 38 C.F.R. § 4.130, Diagnostic Code 9413, pertaining to unspecified anxiety disorder. 

Diagnostic Code 9413 is subsumed into the General Rating Formula for Mental Disorders (General Rating Formula). Under the General Rating Formula, a 30 percent evaluation is warranted when there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, or mild memory loss (such as forgetting names, directions, and recent events). 38 C.F.R. § 4.130, Diagnostic Code 9413, General Rating Formula.

A 50 percent evaluation is warranted when there is occupational and social impairment with reduced reliability and productivity due to such symptoms as flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory for example, retention of only highly learned material, forgetting to complete tasks; impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships. Id.

A 70 percent evaluation is warranted where the disorder is manifested by occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as suicidal ideation; obsessional rituals which interfere with routine activities; speech that is intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately, and effectively; impaired impulse control, such as unprovoked irritability with periods of violence; spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances, including work or a work-like setting; and an inability to establish and maintain effective relationships. Id.

A 100 percent disability evaluation is warranted when there is total occupational and social impairment, due to such symptoms as: persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time and place; memory loss for names of close relatives, own occupation, or own name. Id.

In evaluating the evidence, the Board also considers the various Global Assessment of Functioning (GAF) scores that clinicians have assigned. The GAF is a scale reflecting the psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. See Diagnostic and Statistical Manual of Mental Disorders (4th ed.) (DSM-IV); Carpenter v. Brown, 8 Vet. App. 240 (1995). 

Although GAF scores are important in evaluating mental disorders, the Board must consider all the pertinent evidence of record relevant to the time periods in question and set forth a decision based on the totality of the evidence in accordance with all applicable legal criteria. See Carpenter, 8 Vet. App. at 242. Accordingly, an examiner's classification of the level of psychiatric impairment, by word or by a GAF score, is to be considered, but is not determinative of the percentage VA disability rating to be assigned; the percentage evaluation is to be based on all the evidence that bears on occupational and social impairment. Id.; see also 38 C.F.R. § 4.126 (2015).

Turning to the record, VA treatment reveals that during 2003 the anxiety disorder symptoms experienced by the Veteran included suicidal ideation with a GAF score of 35 being reported. Thereafter, but prior to March 24, 2008, however, a more moderated symptomatology is shown characterized by daily intrusive thoughts, anger, anxiety, nightmares, exaggerated startle response, depression, and irritability. The Veteran indicated he was working at maintaining his relationship with his third wife as well as repairing his relationships with his three children. The Veteran denies suicidal and homicidal ideation throughout this period. The GAF score reported during this period is 55. 

In a September 2007 Notice of Fully Favorable Decision, the Social Security Administration (SSA) determined that the Veteran's depression and posttraumatic stress disorder (PTSD) were severe impairments. SSA also found the Veteran had not engaged in what it defines as substantial gainful activity since October 4, 2006. 

The Veteran was provided a VA examination in February 2008. At that time he presented clean, neatly groomed, and appropriately dressed. He was fully oriented with clear speech. His thought process was circumstantial and he experienced sleep impairment and depression. He had no problems with delusions, hallucinations, judgement, inappropriate behavior, obsessive or ritualistic behavior, panic attacks, homicidal thoughts, or completing the activities of daily living. Impulse control was reported to be fair. The examiner noted a history of passive suicidal ideation with no actual attempts. The Veteran expressed no current suicidal ideation and the examiner found him to be a low risk for self-harm. The Veteran reported his relationship with his wife as being "relatively well" and noted he was in the process of reconciling with his sons. A GAF score of 65 was indicated. 

From March 24, 2008, until July 14, 2009, VA treatment records show the Veteran experienced intrusive thoughts, nightmares, generalized anxiety, depression, and difficulty maintaining relationships. He denied suicidal and homicidal ideation. During this period reported GAF scores ranged from 50 to 55. In a March 24, 2008, VA psychiatry outpatient note a VA staff psychiatrist who had been treating the Veteran indicated the level of the Veteran's "anxiety is such that it interferes with his ability to concentrate and he has been unable to work for the past two years." The psychiatrist continued by noting this also interferes with the Veteran's personal and social relationships. The psychiatrist concluded the Veteran's anxiety disorder warranted a 50 percent evaluation. 

The same VA psychiatrist reports in a July 14, 2009, note that the Veteran experienced anxiety, depression, and intrusive thoughts. The psychiatrist concluded the Veteran's "anxiety symptoms and intrusive thoughts interfere with his ability to focus, concentrate and complete tasks. He isolates to avoid triggers and this limits his social and interpersonal life. As he is unable to complete tasks, I believe he is unemployable." The psychiatrist also expressed the opinion that the Veteran's anxiety disorder warranted a rating in excess of 50 percent. From July 14, 2009, through the remainder of 2009, reported GAF scores ranged from 46 to 50. 

The Veteran was provided another VA examination in February 2010. The Veteran presented at the examination clean, neatly groomed, appropriately dressed and fully oriented. His symptoms included daily moderate anxiety, daily moderate depressed mood, constricted affect, and reduced impulse control. He had no problems with thought process, thought content, delusions, hallucinations, judgement, inappropriate behavior, panic attacks, obsessive or ritualistic behavior, or his ability to maintain minimum personal hygiene. He described his relationship with his wife as okay and with his children as fine. He reported having three to four close friends. His GAF score was reported to be a 58. 

In a July 2011 note, the Veteran's VA psychiatrist repeated his opinion that the Veteran's severe symptoms of anxiety render him unemployable. Treatment notes from 2011 show the Veteran experienced nightmares, flashbacks, irritability, and passive suicidal ideation. 

Following review of the evidence of record, the Board concludes that an initial evaluation of 70 percent is warranted for the entire appeals period. In a July 14, 2009, treatment record, the Veteran's VA psychiatrist stated the Veteran's "anxiety symptoms and intrusive thoughts interfere with his ability to focus, concentrate and complete tasks. He isolates to avoid triggers and this limits his social and interpersonal life. As he is unable to complete tasks, I believe he is unemployable." The VA psychiatrist suggested this level of impairment warranted an evaluation in excess of 50 percent. As such, the Veteran was awarded a 70 percent rating effective July 14, 2009, however, reviewing the evidence shows that the Veteran's disability picture did not change substantively throughout the appeal period. So, while there is not an opinion prior to July 14, 2009, that is as explicit in indicating the level of social and occupational impairment caused by anxiety disorder, the record shows that the Veteran's symptomatology is generally consistent both before and after July 14, 2009. Therefore, affording the Veteran the benefit of the doubt, the Board finds, throughout the appeal period, anxiety disorder results in occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgement, thinking, or mood, which warrants a 70 percent rating. 38 C.F.R. § 4.130, Diagnostic Code 9413. 

Nevertheless, a 100 percent evaluation is not warranted at any time during the appeals period as there was no evidence of any gross impairment in thought process or communication, persistent delusions or hallucinations, grossly inappropriate behavior, persistent danger of hurting self or others, intermittent inability to perform activities of daily living, disorientation to time or place, severe memory loss, or other symptoms of similar severity that would show a total disability rating is warranted. See 38 C.F.R. § 4.130, Diagnostic Code 9413. Similarly, while the evidence indicates total occupational impairment throughout the appeals period, the Veteran's social impairment is less than total. This was evidenced by the Veteran maintaining his relationship with his wife, attempting to improve his relationships with his children, as well as the Veteran having a few friends. This is not to say his anxiety disorder did not cause strain and limitations on these relationships, but it does show less than total social impairment. 

Finally, in regard to the Veteran's GAF scores, they range from 46 to 65 throughout the appeal period. A GAF score ranging between 41 and 50 is indicative of "serious" symptoms or any serious impairment in social, occupational, or school functioning (no friends, unable to keep a job). While a GAF score between 51 and 60 is indicative of "moderate" symptoms or moderate impairment in social, occupational, or school functioning (few friends, conflicts with peers or co-workers). A GAF score between 61 and 70 is indicative of "some mild" symptoms or some difficulty in social, occupational, or school functioning. See DSM-IV. Therefore, the Board observed that the Veteran's GAF scores have reflected mild to serious symptoms. While the Veteran's GAF scores indicate a disability picture that, at times, is less severe than what is commonly associated with the assigned evaluation, the Board finds this does not change the fact that overall the evidence of record supports impairment warranting a 70 percent evaluation throughout the appeals period. 

The Board acknowledges that a GAF score of 35 was recorded in 2003; however, there are two issues with this score. First, the score appears to be an outlier as a score this low is not record at any other point in the treatment records. Second, this score was reported well before the Veteran's claim was filed. So while it was taken into consideration when determining the appropriate rating for the Veteran's anxiety disorder it was afforded less weight because of it inconsistency with the other scores of record as well as its being so far outside the time period for which a rating was being considered. 

Overall, affording the Veteran the benefit of the doubt, the evidence discussed supports a finding that the Veteran's anxiety disorder result in occupational and social impairment with deficiencies in most areas warranting a 70 percent evaluation. An evaluation higher than 70 percent is not warranted as a preponderance of the evidence is against such a finding.
 
II. Extraschedular Consideration
 
The Board also has considered whether the Veteran is entitled to a greater level of compensation on an extraschedular basis during either period. Ordinarily, the VA Schedule will apply unless there are exceptional or unusual factors which would render application of the schedule impractical. See Fisher v. Principi, 4 Vet. App. 57, 60 (1993).

According to the regulation, an extraschedular disability rating is warranted based upon a finding that the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization that would render impractical the application of the regular schedular standards. See 38 C.F.R. § 3.321(b)(1) (2015). An exceptional case is said to include such factors as marked interference with employment or frequent periods of hospitalization as to render impracticable the application of the regular schedular standards. See Fanning v. Brown, 4 Vet. App. 225, 229 (1993).

Under Thun v. Peake, 22 Vet App 111 (2008), there is a three-step inquiry for determining whether a Veteran is entitled to an extraschedular rating. First, the Board must determine whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Second, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology and is found inadequate, the Board must determine whether the claimant's disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Third, if the rating schedule is inadequate to evaluate a Veteran's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Director, Compensation Service, to determine whether, to accord justice, the Veteran's disability picture requires the assignment of an extraschedular rating.

With respect to the first prong of Thun, the evidence in this case does not show such an exceptional disability picture that the available schedular evaluation for the service-connected disability is inadequate during either period. A comparison between the level of severity and symptomatology of the Veteran's anxiety disorder with the established criteria found in the Rating Schedule for this disability shows that the rating criteria reasonably describes the Veteran's disability level and symptomatology. Specifically, the Rating Schedule provides for ratings based on the level of social and occupational impairment caused by the Veteran's anxiety disorder. While specific manifestations suggestive of certain degrees of impairment are listed under the General Rating Formula for Mental Disorders, the Board is not limited to considering only the impairment caused by the listed manifestations. Such open criteria allow the Board to ensure that the entire disability picture is taken into consideration when assigning a schedular rating. 

As the first prong of Thun has not been satisfied, the Board has determined that referral of this case for extraschedular consideration pursuant to 38 
C.F.R. 3.321(b)(1) is not warranted.

III. TDIU

Entitlement to TDIU requires the presence of impairment so severe that it is impossible for the average person to secure or follow a substantially gainful occupation. Consideration may be given to the Veteran's level of education, special training, and previous work experience in arriving at a conclusion, but not to his age or to the impairments caused by non-service-connected disabilities. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 3.340, 3.341, 4.16, 4.19 (2015). In reaching such a determination, the central inquiry is "whether the Veteran's service-connected disabilities alone are of sufficient severity to produce unemployability." Hatlestad v. Brown, 5 Vet. App. 524, 529 (1993).

The record must reflect that circumstances, apart from non-service-connected conditions, place the claimant in a different position than other veterans having the same compensation rating. The sole fact that a claimant is unemployed or has difficulty obtaining employment is not enough. A high rating in itself is recognition that the impairment makes it difficult to obtain or keep employment. The ultimate question is whether the Veteran, in light of his service-connected disabilities, is capable of performing the physical and mental acts required by employment, not whether he can find employment. Van Hoose v. Brown, 4 Vet. App. 361 (1993).

The law provides that a total disability rating may be assigned where the scheduler rating is less than total, when the person is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities, provided that, if there is only one such disability, this disability shall be ratable at 60 percent or more, or if there are two or more disabilities, there shall be at least one disability ratable at 40 percent or more and sufficient additional disability to bring the combined rating to 70 percent or more. 38 C.F.R. § 4.16(a). The Veteran met the schedular requirements, as his anxiety disorder evaluation was 70 percent throughout the appeal period. Id. 

The Veteran has already been granted TDIU effective July 14, 2009, the date of the note in which the Veteran's VA psychiatrist provided the opinion that the Veteran is unemployable due to his anxiety disorder. The Board here again notes that the Veteran's anxiety disorder symptomatology is largely consistent throughout the appeals period. Therefore, despite the fact that a formal opinion indicating the Veteran is unemployable is not provided until July 14, 2009, affording the Veteran the benefit of the doubt, TDIU is warranted throughout the appeal period. This is because the symptomatology that caused the VA psychiatrist to conclude the Veteran was unemployable on July 14, 2009, existed prior to this date.

Further support is lent to the Board's conclusion by the SSA determination. The Board notes that while it is not bound by this SSA determination, the determination is nevertheless relevant. See Martin v. Brown, 4 Vet. App. 136, 140 (1993) (while a SSA decision is not controlling for purposes of VA adjudication, it is "pertinent" to a veteran's claim). First, the SSA rendered a fully favorable decision, at least partially, based on a finding that the Veteran depression and PTSD were severe impairments. Second, SSA found the Veteran had not engaged in substantial gainful activity since October 4, 2006. 

For reasons stated below, affording the Veteran the benefit of the doubt, the Board finds that the evidence of record demonstrates that the Veteran's service-connected anxiety disorder renders him unable to secure or follow a substantially gainful occupation, prior to July 14, 2009.


ORDER

Entitlement to a rating of 70 percent, but no greater, prior to July 14, 2009, is granted, subject to the laws and regulations governing the payment of monetary benefits.

Entitlement to a rating in excess of 70 percent from July 14, 2009, is denied.

Entitlement to a TDIU, prior to July 14, 2009, is granted.


REMAND

The Veteran also claimed entitlement to service connection for bilateral hearing loss and tinnitus. These issues were previously before the Board in August 2010, at which time the Board noted a May 2008 private opinion linking the Veteran's current hearing loss and tinnitus to service as well as a June 2009 VA audiological opinion concluding the opposite are both inadequate. The May 2008 opinion was found inadequate because it lacked a rationale and did not reflect consideration of prior medical treatment.

The June 2009 VA audiological opinion was found inadequate because the examiner stated that the Veteran's military entrance and separation examinations in July 1965 and December 1968, respectively, showed normal hearing at all levels from 500 to 6000 Hertz, a finding that is not consistent with the service treatment records.

The Board notes that the results of such testing appear at first glance to show puretone thresholds at 20 decibels or below from 500 to 4000 Hertz bilaterally, and also at 6000 Hertz except for in the left ear during the entrance examination, which was 25 decibels. The auditory threshold for normal hearing is from 0 to 20 decibels, and higher threshold levels indicate some degree of hearing loss. Hensley v. Brown, 5 Vet. App. 155, 157 (1993). However, impaired hearing is not considered a disability for VA purposes unless the auditory threshold in any of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz is 40 decibels or greater; when the auditory thresholds for at least three of these frequencies are 26 decibels or greater; or when speech recognition scores using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385. 

Service department audiometric readings prior to October 31, 1967, are presumed to be in American Standards Association (ASA) units and must be converted to International Standard Organization (ISO) units to be compared with later results. The Veteran's service entrance examination was conducted in July 1965. Further, although his separation examination was conducted in December 1968, the report specifies that that the "ASA51" audiometer was used. As such, both the entrance and separation examinations must be converted from ASA to ISO units. When applying the conversion formula, the Veteran's puretone thresholds at entrance and separation from service were as follows:

At the time of the July 1965 enlistment examination (converted to ISO units), puretone thresholds, in decibels, were as follows


500 Hz
1000 Hz
2000 Hz
3000 Hz
4000 Hz
6000 Hz
Right
10
5
10
15
10
20
Left
20
15
20
25
15
35

At the time of the December 1968 separation examination (converted to ISO units), puretone thresholds, in decibels, were as follows:


500 Hz
1000 Hz
2000 Hz
3000 Hz
4000 Hz
6000 Hz
Right
15
5
10
25
15
20
Left
15
10
20
30
15
20

The Board notes that the Veteran denied any subjective hearing loss or ear problems at both the entrance and separation examinations, and there was no diagnosis of hearing difficulties at either point. The Board further notes that the Veteran did not meet VA's definition for a hearing loss disability during service. However, it is not necessary to meet VA's criteria for a hearing loss disability during service to warrant service connection. Ledford v. Derwinski, 3 Vet. App. 87 (1992). As the measured puretone thresholds were over 20 decibels at some levels, the Veteran's hearing was not "normal" at all levels as stated by the VA examiner.

Despite all this being noted in the February 2012 Board remand, the December 2015 VA audiologist's opinion, provided in response to the remand, used the same erroneous rational as the June 2008 VA audiologist. The December 2015 VA audiologist, in support of the conclusion that hearing loss and tinnitus are less likely as not caused by or a result of noise exposure in the military, stated "[t]he induction and separation audiograms indicate normal hearing bilaterally without significant threshold shift." (emphasis added). The VA audiologist went on to note that "[t]here is no significance of puretone thresholds above 20 db during entrance and separation evaluations. The range of normal hearing is from 0-25 dBHL." 

As noted, the auditory threshold for normal hearing is from 0 to 20 decibels, and higher threshold levels indicate some degree of hearing loss. Hensley at 157. The VA audiologist's rational stands in contradiction to this and, therefore, at the very least needs further explanation. Furthermore, even if normal hearing is "from 0-25 dBHL" the VA audiologist's determination that the Veteran's hearing loss was normal at enlistment and separation audiograms ignores the fact that once converted to ISO units there is a finding of 35 dB for the left ear at 6000 Hz at enlistment and 30 dB for left ear at 3000 Hz at separation.

Additionally, in concluding that tinnitus is at least as likely as not etiologically related to military service, the December 2015 VA audiologist cited the Veteran's denial that he experienced tinnitus at the June 2008 VA examination. As noted in the previous remand, the Veteran reported intermittent tinnitus to a private provider for the purposes of an audiological examination and etiological opinion in May 2008. Similarly, he stated in his September 2008 substantive appeal (VA Form 9) that he did not deny tinnitus during the VA examination but, rather, reported intermittent noise frequency that was more constant than not. A veteran is competent to diagnosis tinnitus by its observable manifestations; as such condition is readily observable and does not require medical expertise to establish its existence. See Charles v. Principi, 16 Vet. App. 370 (2002). 

As such, an addendum opinion should be obtained that addresses the deficiencies in the December 2015 opinion. Barr v. Nicholson, 21 Vet. App. 303, 311 (2007) (holding that, once VA undertakes the effort to provide an examination, it must provide an adequate one or, at a minimum, notify the veteran why one will not or cannot be provided).
 
Accordingly, the case is REMANDED for the following action:

1. Return the claims file to the provider of the December 2015 opinion, for an addendum opinion. If unavailable, the claims file should be forwarded to another VA examiner. The entire claims file must be reviewed by the examiner in conjunction with the examination. 

The examiner should address, with respect to hearing loss, 
was such condition at least as likely as not (probably of 50 percent or more) incurred as a result of military noise exposure? Also, was there at least as likely as not hearing loss manifested to a compensable degree within one year following the Veteran's separation from service, or by December 1969?

In offering the above opinion, please consider all evidence of record, to include the converted puretone thresholds from service evaluations. Also, please comment on the significance, if any, of the puretone thresholds above 20 dB during the entrance and separation evaluations.

If puretone thresholds above 20 dB at enlistment and separation are found to have no significance please explain why in light of the finding in Hensley v. Brown, 5 Vet. App. 155, 157 (1993) that the auditory threshold for normal hearing is from 0 to 20 decibels, and higher threshold levels indicate some degree of hearing loss.

Additionally, please specifically comment on the puretone thresholds of 35 dB for the left ear at 6000 Hz at enlistment and 30 dB for the left ear at 3000 Hz at separation.

With respect to tinnitus, is it at least as likely as not (probably of 50 percent or more) that the Veteran's current tinnitus was incurred or aggravated by his military noise exposure?

In offering this opinion please consider the Veteran's statement that he in fact did not deny tinnitus during the June 2008 VA examination but, rather, reported intermittent noise frequency that was more constant than not.

2. Then, the claims must be readjudicated. If the determination of the either claim remains, the appellant and her representative must be furnished with a Supplemental Statement of the Case and given an opportunity to respond before the case is returned to the Board. 

The appellant has the right to submit additional evidence and argument on this matter. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This appeal must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate 
action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
A. C. MACKENZIE
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs